(No. 5312—Claim )

FRANK DOBBS, Individually and FRANK DOBBS, Father and Next Friend of DAVID DOBBS, A Minor, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed March 14, 1974.*

JOSEPH P. SMITH, JR., Attorney for Claimant.

WILLIAM J. SCOTT, Attorney General; WILLIAM E. WEBBER, Assistant Attorney General, for Respondent.

BURKS, J.

This is an action for personal injuries sustained by the claimant, David Dobbs, when a hand grenade exploded in his hands. Claimant, who was just under 16 years of age at the time of his injury, alleges that members of the Illinois National Guard were, in effect, responsible for placing this dangerous explosive in claimant's hands. Hence he seeks damages for his inju-

ries which include the loss of his right hand and the fourth and fifth fingers of his left hand.

Claimant, who lived just 2 blocks from the National Guard Armory in Mattoon, was a frequent visitor to the 2 brick garage buildings north of the main armory which were used for the storage, service and maintenance of motor vehicles belonging to the National Guard.

Over a period of several years, prior to his injury, claimant went to these garages almost daily during summer vacations from school and on some school days. Frequently claimant would assist the military personnel at the garages in performing light jobs, such as sweeping, painting and washing vehicles. There is no evidence that claimant's assistance was solicited or other than voluntary, but apparently was appreciated. Claimant became well acquainted with members of the Guard employed in the maintenance shop, particularly Richard E. Highland, the shop chief, with whom claimant would occasionally go squirrel hunting; also George H. Schnapp, whom claimant once helped move his personal property from one residence to another; and Sgt. Junior Scott, another mechanic at the garage, all of whom testified at the hearing as witnesses for the respondent.

Raymond Wines, claimant's neighbor about the same age, would often accompany the claimant to the garage and both would loaf around or do about the same little chores for the guardsmen. These boys were sometimes allowed to ride on military vehicles, though never on maneuvers or on vehicles transporting ammunition. The boys were also given used items of military apparel, such as a pair of pants, a fatigue jacket, a pair of boots, and empty ammunition boxes, all items that were described as disposable and would otherwise be thrown in the trash barrel.

The above uncontroverted facts lead us directly to the first key issues of facts in dispute: How did claimant obtain possession of the hand grenade that caused his injury? How did claimant obtain the additional powder which he added to the "practice" hand grenade which transformed it from a harmless "simulated" grenade, that would do no damage, into the destructive weapon that exploded in his hands?

It seems obvious to the court that the practice grenade and the dangerous ingredients claimant added to it was property belonging to the Illinois National Guard. How these particular items came into claimant's possession remains a mystery after carefully weighing the conflicting testimony in the record. Except for the .22 caliber rifle shells, the same is true of the other items of ammunition which claimant had in his room for some time prior to his accident.

We agree with claimant's contention that the receipt from Lt. Col. Lang, which claimant submitted in evidence, establishes the fact that the ammunition in claimant's possession prior to his accident was property belonging to the National Guard. But, the receipt merely establishes ownership. It does not negate the possibility that the items mentioned were taken from the Guard's trucks or weapon carriers, after they came in from training maneuvers, without the knowledge or consent of any officer or member of the Guard.

The one exception, established by the record, was the .22 caliber rifle shells. Shop Chief Highland acknowledged that he had given the claimant such ammunition when Highland and his son, about claimant's age, would take claimant with them to hunt squirrels. Highland said that this .22 ammunition could be bought by the carton any place in town; that he always kept .22s in his

desk; and that he gave claimant a box of .22s to go squirrel hunting. However, there is no evidence that the .22 caliber shells were in any way used in, or in connection with, the hand grenade that caused claimant's injuries.

Highland emphatically denies that he ever gave the claimant, or ever knew that the claimant ever had in his possession any ammunition of any kind other than the .22 caliber shells. Highland specifically included the simulated hand grenade, smoke bombs, and other ingredients, in disclaiming any knowledge that such items were ever in claimant's possession. Equally firm and positive in their testimony to the same effect were all other witnesses connected with the National Guard who testified in this cause. This includes George H. Schnapp and Junior Scott, the only others mentioned by claimant as possible suppliers of the black powder he obtained and used to potentiate the hand grenade.

On the other hand, a careful examination of claimant's testimony indicates that he was never sure or positive as to where he obtained the simulated hand grenade. Whenever he expressed the belief that Dick Highland gave it to him, he added qualifying expression of uncertainty.

In one of claimant's first statements after his accident, he answered a question from Mattoon Police Chief, Ed Horn, as to where he got the hand grenade. Claimant replied, "Maintenance shop. Dick Highland, who is in charge of the maintenance shop, *I believe* gave it to me. *I am not sure.*" (Emphasis supplied)

Later, at the hearing, claimant's counsel asked him a series of questions as to how, when and where he obtained the grenade without eliciting any positive or

unqualified answers. From the record, we quote the following questions asked by claimant's attorney and the answers given by the claimant:

"Q. Now did you ever receive a hand grenade out there? [National Guard Garage]

A. Yes.

Q. And do you remember when you received this? [The hand grenade.]

A. No, I couldn't tell you.

Q. Do you have any judgement as to when you received it?

"A. Oh, three or four months or so before the accident.

Q. Was this in any way connected with a training trip by the National Guard?

A. The way I got it was, it was some they'd brought back with them from field maneuvers or something.

Q. Had you seen other hand grenades, other than the one you got out there at the National Guard garages?

A. Yes, sir, just pieces of them.

Q. Was this [grenade] assembled at the time you first saw it?

A. No.

Q. Well, where did you find it, or where did you first see it, the first time you ever saw this hand grenade?

A. It was in the trunk of Dick Highland's car, *I believe.*" [Emphasis supplied]

The court finds it strange that a boy almost 16 years old could not be more explicit as to where and how he obtained an item as unique as a practice hand gre-

nade. Several witnesses for the claimant said they knew claimant had and kept in his room a smoke bomb or two, and some items of ammunition that appeared to be from the Guard, but no witness corroborated claimant's uncertain belief that Highland, or anyone else from the Guard, gave him a hand grenade.

Raymond Wines, claimant's constant companion on their numerous visits to the armory maintenance shop, testified that he had never seen a hand grenade there.

In any event, the National Guard personnel are all steadfast and positive in their statements throughout that they did not give a grenade to the claimant or any other unauthorized person. Even if claimant had been equally positive and unequivocal as to how he obtained the grenade, his uncorroborated statement would hardly amount to a "preponderance of the evidence". The rule is stated in *Brady v. Chaffee*, 163 Ill.App. 242 as follows:

"An affirmative statement by one witness met by a flat categorical denial by another of equal credibility, does not meet the requirement of the law that the plaintiff must make out his or her case by a preponderance of the evidence."

The court cannot accept the argument, so ably presented in claimant's well prepared brief, that it is reasonable to assume that claimant was given the hand grenade, or authorized to take it, by some member of the National Guard in consideration of the chores claimant did for the guardsmen. Logical as this assumption might appear, it is conclusively refuted by the evidence. We do accept claimant's theory as to the items of clothing, the empty ammunition boxes, and the 22 caliber rifle shells. This conclusion is supported by the record. But these items had nothing to do with claimant's injuries. The overwhelming weight of the evidence supports a different assumption as to the hand grenade which became the instrument of claimant's injury.

We do not hold that there is no evidence of any negligence whatsoever on the part of the respondent. Perhaps, as claimant suggests, it was negligence per se if respondent failed to prevent any unauthorized person from obtaining access to any explosives on its premises, even smoke bombs and simulated grenades which, according to the record, are not dangerous if properly used. These items were not "calculated to do injury" and, therefore, not "considered to be dangerous per se" under the rule stated in *57 Am. Jur.2d, Negligence, §109.*

Perhaps it should have been foreseeable that the practice grenades, which are just designed to create a noise and puff of smoke, could be potentiated into a dangerous instrument as claimant did. This suggestion would be more persuasive if claimant had been a child of such tender years that he could not be guilty of contributory negligence as a matter of law. *Cicero State Bank* v. *Dolese & Shepard*, 298 Ill.App. 290.

We agree that claimant did not come upon premises of the National Guard maintenance garage as a trespasser. But whether his status on the premises was that of an invitee or a mere licensee is not significant here. There is no proof in the record that respondent breached its duty to use reasonable care for the safety of claimant on its premises even if he were an invitee. See *I.L.P. Negligence §51-52.* From the same volume and chapter in §62, we find the rule, applicable here, that respondent owned no greater duty to the claimant than it would to any adult:

"Children have no greater right to go upon other people's property than adults have, and the mere fact that they are children does not, of itself, impose a duty on an owner or person in charge of property to expect them or prepare for their safety."

In any event, we need not comment further on the probability that there was some negligence on respond-

ent's part, since the record supports our finding the claimant was contributorily negligent.

This court is bound by the well established rule of law in Illinois that a claimant must be free from contributory negligence in order to recover damages. This rule was carefully re-examined and upheld by the Illinois Supreme Court in *Maki* v. *Frelk* (1968) 40 Ill.2d 193, reversing the Appellate Court which had attempted to change the *contributory negligence* rule and adopt the *comparative negligence* doctrine. [*85 Ill.App.2d 439*] The law remains unchanged.

We are mindful of the fact that claimant was a minor, just under 16 years of age, at the time of his unfortunate accident. However, the law is equally well settled in this state that, a claimant 14 years of age or over is required to prove freedom from contributory negligence as in the case of an adult, except that his intelligence and experience is considered. *Callaghan's Illinois Digest (3rd Ed.) Negligence §58.5. I.L.P. Negligence §⅓^^. Lester Simmons, a minor, et al* v. *State* 26 C.C.R. 351.

Claimant does not plead any lack of experience with the explosive device which caused his injury. He knew exactly what he was doing when he overloaded the relatively harmless hand grenade "to make it a more destructive type of grenade", as he said at the hearing.

Claimants testimony reveals that he had a thorough knowledge of the hand grenade; how to assemble it; load it; put in a cork and firing pin; and that you could shoot it over and over if you did not overload it with powder. He said he had fired this grenade "once or twice" during the 3 or 4 months since he obtained it.

After admittedly packing and overloading the gre-

nade with powder, he knew and appreciated the danger of this explosive instrument. As stated in his brief, "he was proud of the fruits of his ingenuity and wanted all of his companions to view with awe an object probably never seen by any of them before".

So, on the date of his injury, claimant took the grenade into an automobile driven by his friend, Raymond Wines. Claimant exhibited the grenade to the 5 other passengers. Claimant handed the grenade to one of the passengers while claimant crawled over into the front seat. When claimant turned around to get the grenade, the other passenger had pulled the pin, putting the grenade in a "hot" condition. Claimant, realizing the imminent danger of explosion, snatched the grenade from his fellow passenger and attempted to toss it out of the automobile. Before succeeding, and while his hands were cupped over the grenade, it exploded. Claimant lost his right hand and 2 fingers of his left hand. No one else was seriously injured.

It is undoubtedly true that there would have been many more severe injuries to others in the car if claimant had not acted as he did, displaying a high sense of respect for lives of others. Claimant's heroic act also displayed his admitted knowledge of the dangerous explosive device he had created and which caused his unfortunate accident.

Knowing its potential danger, claimant negligently placed the live grenade in the hands of an inexperienced companion. Claimant obviously could not and did not prove that he was free from contributory negligence. Therefore, this claim must be denied.